Sealed
Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*December 07, 2021*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA § <br> § <br> v. § <br> § <br> PETER MILLER, § <br> § <br> Defendant. § | Criminal No. **4:21-cr-570** <br><br> <u>UNDER SEAL</u> |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

### Relevant Market Background

1. Natural gas was an energy commodity that was traded by buyers and sellers through different types of commercial transactions, including at physical delivery locations throughout the United States.

2. One way to trade natural gas was to buy or sell a "futures contract." A futures contract was an agreement that obligated the contracting parties to buy or sell a product or financial instrument at a fixed quantity and price for delivery at a specific date and time in the future.

3. Futures contracts were traded on exchanges—designated commodities markets regulated by the United States Commodity Futures Trading Commission ("CFTC"), including, among others, the New York Mercantile Exchange, Inc. ("NYMEX") and the Chicago Mercantile Exchange ("CME"). NYMEX and CME (together, the "Exchanges") each listed different products for trading, including natural gas futures contracts, and issued and enforced rules and procedures

for trading on their respective exchanges. The Exchanges operated through servers located in Illinois.

4. "Henry Hub"—a natural gas delivery location (or hub) near Louisiana's Gulf Coast that connected several intrastate and interstate pipelines—was used as the standard pricing reference for natural gas futures contracts.

5. The Exchanges offered the opportunity to trade in Henry Hub futures contracts, which were priced based upon the price of natural gas at the Henry Hub delivery point during specified time periods.

6. "Offsetting" trades were opposite transactions for an equal number of futures contracts in the same delivery month that netted out a purchase or sale of futures contracts and "closed" a position. By offsetting a futures contract, a trader canceled any delivery obligation of the underlying commodity. The net gain or loss on the trade was equal to the difference between the price of the futures contract when the trade was initiated and the price when it was offset.

7. Futures contracts could be traded on the Exchanges directly through their electronic platforms or through a registered broker who served as an intermediary to match a willing buyer and seller. After matching a willing buyer and seller, a broker submitted the executed trade to one of the Exchanges for reporting and clearing. Brokers were prohibited from taking the other side of a customer's order absent written consent from the customer and compliance with applicable Exchange rules.

8. With limited exceptions, all purchases and sales of commodity futures were required to be executed openly and competitively. One exception to this requirement was for certain trades called "block trades," so long as the block trades complied with specific requirements under the Exchange rules. Block trades were permissible, privately negotiated

transactions that met certain Exchange-determined quantity thresholds and were reported to and entered on the Exchange for price reporting and clearing. While block trades were not negotiated on the open market, under Exchange rules, block trades were required to be executed at fair and reasonable prices, taking into account, among other factors, the circumstances and prices of the market.

9. "Fictitious" sales were prohibited trades that were not bona fide, arms-length transactions. Trades that negated market risk and competition, such as prearranged trades that were noncompetitive trades based upon an express or implied agreement or understanding and predetermined terms, and accommodation trades that were noncompetitive trades intended to assist another person's illegal trades, were considered prohibited fictitious sales.

### The Defendant and Other Relevant Individuals

10. **PETER MILLER,** a resident of Puerto Rico, was a natural gas trader and owner of Omerta Capital, LLC ("Omerta").

11. Mathew Webb ("Webb"), a resident of Houston, Texas, was the owner, president, and a registered "associated person" of Classic Energy, LLC ("Classic Energy"). In this role, Webb worked as a broker for trades placed on behalf of Classic Energy's customers in exchange for commission fees.

12. Person 1, a resident of The Woodlands, Texas, was employed in various positions at Company B, including natural gas trader, Director of East Trading, and President.

13. "Person 2", a resident of Conroe, Texas, was a natural gas trader employed at Company B.

### Relevant Entities

14. Classic Energy was a registered brokerage firm in Houston, Texas, operated by Webb, that provided brokerage services in various energy markets in exchange for commission fees, including the facilitation of block trades in natural gas futures contracts between Classic Energy's customers and others in the market.

15. "Company B," located in Houston, Texas, was an energy company that engaged in, among other business, the trading of natural gas products in the United States. Company B employed Person 1 and was a customer of Classic Energy.

16. Omerta was a trading company incorporated in Delaware and based in Puerto Rico. **MILLER** established Omerta and used the company to execute trades. **MILLER**, through Omerta, placed orders that were brokered by Classic Energy.

### COUNT 1

### Conspiracy to Commit Commodities Fraud
### (18 U.S.C. § 1349)

17. Paragraphs 1 through 16 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

18. From in or around August 2015 through in on around December 2018, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

### PETER MILLER,

knowingly and willfully, that is, with the intent to further the object and purpose of the conspiracy, conspired and agreed with others, known and unknown to the Grand Jury, to commit an offense against the United States, namely: to knowingly and with the intent to defraud execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, namely, natural gas futures contracts, in violation of Title 18, United States Code, Section 1348.

## OBJECT AND PURPOSE OF THE CONSPIRACY

19. The object and purpose of the conspiracy was for **MILLER** and his co-conspirators, including Webb, Person 1, Person 2, and others, known and unknown to the Grand Jury, to enrich themselves from the profits derived from fraudulent and unlawful commodities trading practices and misappropriation of material, nonpublic information.

## MANNER AND MEANS OF THE CONSPIRACY

20. The manner and means by which **MILLER** and others, known and unknown to the Grand Jury, sought to accomplish and did accomplish the object and purpose of the conspiracy included, but were not limited to, the following:

   a. **MILLER,** Webb, Person 1, Person 2, and others, known and unknown to the Grand Jury, misappropriated Company B's material, non-public information and engaged in fraudulent, noncompetitive trades and prohibited sales, including prearranged trades, in natural gas futures contracts for **MILLER's** own personal gain and that of his co-conspirators.

   b. By entering the fraudulent trades, **MILLER** and others caused prices to be reported, recorded, and registered on the Exchanges that were not true, bona fide prices.

   c. To execute the scheme, Person 1 and Person 2 disclosed to **MILLER,** through Webb, Company B's material, nonpublic information concerning Company B's trading interest, including, but not limited to, the timing, quantity, price, and direction of its trading interest (whether to purchase or sell), and any limits to the terms to which Company B would agree ("Inside Information"), knowing and intending that the Inside Information would be misappropriated and used by

5

       **MILLER** to enter into prearranged noncompetitive trades to fill Person 1 and Person 2's orders.

   d. Further using the misappropriated Inside Information from Company B, **MILLER** entered into offsetting transactions designed to benefit from his possession of Company B's Inside Information and to generate profits that he could share with his co-conspirators.

   e. The net profits from these fraudulent trades were split between **MILLER**, Webb, Person 1, and other co-conspirators. Among other things **MILLER** provided cash generated from the fraudulent, pre-arranged trades to Webb and Person 1.

21.   It was further part of the scheme that **MILLER** and others misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purpose of the scheme and the acts done in furtherance of the scheme.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2 THROUGH 5

**Commodities Fraud**
**(18 U.S.C. §§ 1348 and 2)**

22.   Paragraphs 1 through 16 and 19 through 21 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

23. Beginning in or around August 2015, and continuing through in or around December 2018, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant,

## PETER MILLER

and others, known and unknown to the Grand Jury, did knowingly and with the intent to defraud execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, namely, natural gas futures contracts, through fraudulent, noncompetitive trades, including fictitious sales, accommodation trades, prearranged trades, offsetting trades, and non-arms-length trades, on or around the dates listed in the table below, each constituting a separate count of the Indictment.

| COUNT | APPROX. DATE | APPROX. AMOUNT | APPROX. PRICE PER CONTRACT | SELLER | BUYER | PRODUCT |
|---|---|---|---|---|---|---|
| 2 | Feb. 10, 2016 | 100 Contracts | $2.049 | Company B | Omerta | Henry Hub Financial Last Day |
| 3 | March 4, 2016 | 100 Contracts | $1.75 | Omerta | Company B | Henry Hub Financial Last Day |
| 4 | March 10, 2016 | 150 Contracts | $1.775 | Omerta | Company B | Henry Hub Financial Last Day |
| 5 | Sept. 20, 2016 | 150 Contracts | $3.021 | Omerta | Company B | Henry Hub Financial Last Day |

All in violation of Title 18, United States Code, Sections 1348 and 2.

A TRUE BILL:

Signature on File

FOREPERSON

By:

Jennifer Lowery
Acting United States Attorney
Southern District of Texas

_____
Zahra Fenelon
Assistant United States Attorney
Suzanne Elmilady
Deputy Chief, Fraud
United States Attorney's Office
Southern District of Texas
Zahra.Fenelon@usdoj.gov
SElmilady@usa.doj.gov
(713) 567-9309 (Fenelon)
(713) 567-9342 (Elmilady)

Joseph S. Beemsterboer
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

_Leslie S. Garthwaite_
Leslie S. Garthwaite
Della Sentilles
Trial Attorneys
Criminal Division, Fraud Section
Leslie.Garthwaite@usdoj.gov
Della.Sentilles@usdoj.gov
(202) 631-6388 (Garthwaite)
(202) 445-8793 (Sentilles)